Good afternoon, and may it please the Court, my name is Bradley Jenkins, and I represent Petitioner Everth Rodas-Arias. I will be presenting on the Nexus issue presented in our briefing, and my colleague Jerry Levine will be presenting on our claim under the Convention Against Torture. The first issue presented by this petition is whether, when MS-13 threatened to, quote, come and kill every member of Mr. Rodas's family until there was no one left, whether under those facts his membership in his family was at least one central reason for his threatened persecution. The Board's decision in this case nowhere recognizes the collective framing of this threat, and it is the intentional targeting of Mr. Rodas's family as a group that brings his family membership into the center, and not the periphery, of the reasons for his persecution. The mixed motive framework has been treated differently by different circuits. Is your argument that you prevail under any, including our law, or do we have to agree and adopt the Fourth Circuit and the Seventh Circuit's approach for you to prevail? This Court does not need to adopt the Fourth and Seventh Circuit's approach, although we do, of course, believe that approach to be correct. In this case, the entirety of the relevant protected group was targeted. No, that's not my question. I know that's your argument factually. My question is, would your argument, Lew, do you acknowledge you'd lose under any circuit's law, or is your contention that every circuit's framework for assessing mixed motive cases means that the BIA, the record compels a contrary conclusion? Under this circuit's law, I believe that we prevail. I think a useful case, for example, to consider is Ramirez Mejia, in which this Court noted that Ms. Ramirez Mejia's worth to the persecutors was that she possessed certain information about her brother, and that this was perfectly separable from her family relationship to her brother. In contrast here, Mr. Rodas' worth to the persecutors was that he was his son's father, and in addition, this Court in Ramirez Mejia used the idea that multiple reasons can be central if they are inseparable from each other. Other courts have also endorsed that sort of idea, and here, again, because the persecutors were, again, our factual theory being engaging in collective punishment, that really and the membership in the family was intertwined with, or inseparable from. What difference would it make if the whole family is threatened, or just one member? If the whole family is threatened, then it seems clearer that at least one of the central reasons for the targeting of the members of that family. You don't dispute they had a motive to try to recruit. They did in the beginning. It is worth noting that the gang killed the son who they were allegedly attempting to recruit. But I guess if they want to recruit, they clearly don't want to kill, even though that ended up being sort of a byproduct. If their only motive was to recruit, they would not have killed the recruitee. And so, alongside their desire to recruit was their desire to punish the whole of the Rodas family. How can it be that his son, Mr. Rodas' son, would not be entitled to asylum based on gang recruitment, but Rodas as his father, as the target of the recruitment's father, would be based on gang recruitment? Where the tactic of a persecutor is to persecute an entire group, then even if they have other objectives, the one central reason test is satisfied. In the hypothetical where all the gang wants is for the cooperation of an individual person, then that person may well not qualify for asylum. A helpful case for this principle is this court's decision in Sharma, in which this person, the court has to continue beyond that fact and determine whether another motivation also exists alongside the desire for cooperation. In Sharma, it was that Maoist rebels wanted to recruit Mr. Sharma actually for their volleyball team and for other ends, but this court required the board to continue beyond that and consider the possibility that he was also being persecuted for his political opinion that disagreed with those rebels. Multiple central reasons. The basic framework that Congress enacted was that the asylum statute should embrace scenarios where multiple central reasons are present. Our cases, though, talk about per se anger toward the family, per se hatred of the family. Do you have that here? We do not believe that per se hatred is a requirement for asylum. The board, in its Kasinga case, disavowed that that kind of animus was a requirement for asylum, saying that the subjective, punitive, or malignant intent is not required for harm to constitute asylum, and indeed the board's decision in matter of LEA-1 does say that animus against a family appears to be significant, but also considers situations in which animus against a family is not necessary as a requirement. To prevail, do you have to, it isn't, do you accept that you have an evidentiary burden? You've got to say the record compels the conclusion that animus towards the family was at least one central reason, right? That is one of our claims, that given the directness of the persecutor's statement. Are there any other obstacles you'd have to win to get back? In other words, the question of whether or not this harm rose to a level of persecution and or whether a family, an immediate family, can be a protected social group, or do you think both parties agree as to those two points? I think both parties agree that those two issues are not before this court, and that the board would have to address both the likelihood of... Because it never reached? The likelihood of future persecution was never reached by the board, and the government both waived the cognizability of the social group, and of course Attorney General Garland vacated the decision that the board relied on to hold that Mr. Rodas' family itself was not a particular social group. And so under this court's decision, in penios agaravivar, the prudent course again for those unresolved issues would be to remand for further consideration. Counsel, we had two cases recently, Barrios-Bruno and Castro-Rodriguez, which seem to, if not control in this circumstance, certainly shed some insight, might be instructive. Can you distinguish those two? In, certainly in Barrios, the court noted that there was no evidence that the persecutors were after the other members of the family. And so certainly that, I believe, is a relevant distinguishing circumstance. As opposed to here where, I think you said earlier, the entirety of the family was being targeted? Exactly. The express terms of the threat were that we will kill every member of your family until there is no one left. And additionally, an additional case that's, in terms of unpublished cases of this court, that is worth consideration is the Morales-Lopez case, again, where this court noted that where there's a most apparent of targeting families, that that supported, indeed compelled, the feared persecution was on account of a particular . . . What about the Castro-Rodriguez I mentioned to you as well? That's also a Fifth Circuit from this year. I thought that might have been in your briefing. Maybe it wasn't. Castro-Rodriguez? And you'll have to forgive me. I don't believe Castro-Rodriguez, if I remember correctly, Castro-Rodriguez may not have been in any of the briefings. Okay, okay. And so I had not reviewed that case, but I'd be happy to review that and comment on it if the court would like to do that. You know, some of these cases talk about where the family, taking after the family as a means to an end, is not a central reason, like if you have another objective to achieve. I think one of these unpublished cases used that as a reason. How do you get around that? In two ways, Your Honor. First, that this really isn't a means to an end case. That if the objective of the gangs was to recruit the petitioner's son, that they were rather their objective in this case was to punish the family. And because of that framing of this threat, we can distinguish that this is not a means to an end case in the first place. However, we also want to point out that the means to an end formulation is deeply problematic and should not be endorsed by this court. And that's because it would require, by privileging ends over means, that the protected reason be a dominant reason. And even the board rejects a test which requires the protected reason to be dominant. Take for example, additionally, other situations that we, I think, classically consider to be protected persecution, where these generic ends of the accumulation of power or the consolidation of wealth are present. Consider a dictator who recruits or taxes an entire ethnic group or religious minority. And in that way... I think what courts are struggling with, the statutory language talks about what... But we have to distinguish between at least one central and ones that are incidental, superficial, minor, or is that... That's our language in shape, correct? Yes, and we would agree that... You accept that framework. So courts are trying to find out how do we sift. And the means to the ends approach, you're saying, is atextual and doesn't help. But then what is the limiting principle for yours? Every time a parent gets called, the family is a target? We believe that the board had it in part right in LEA when they said it has to be both a but-for cause and more than a minor reason. And I think that generic test is not the same thing as saying that a protected reason is a means to an end. I see my portion of the time is up. If the court has other questions on Nectis, I'm happy to entertain them. Did you reserve time or who's going to reserve? My co-counsel has a few minutes to present on the... Principle. Okay, but who's going to do rebuttal? Mr. Levine will do rebuttal as well. Okay, great. Thank you, your honors. May it please the court. Jared Levine on behalf of the appellant. Remand is required because the board simply failed to address key evidence that establishes the likelihood that Mr. Rodas will be tortured upon his return to El Salvador. The board did acknowledge that MS-13 and police officers working with MS-13 threatened to murder the entirety of Mr. Rodas' family, but the board held that these threats were simply too speculative to meet the requirement of the likelihood of torture. The board, however, failed to address several key facts. Failed to address the fact that the corrupt police had already tortured Mr. Rodas' wife, that the same officers promised to send an extermination group to murder Mr. Rodas' entire family, and that state department reports confirmed that torture by security forces is pervasive in El Salvador, as are the operation of extermination groups, even extermination groups specifically in the city where Mr. Rodas' son was killed and his wife tortured. Clarify the facts a little bit, because he testifies on remand, and there are four children? There were... But one is not biological? One is non-biological. That's the one who's still there? That's the one who's still there. And the youngest is the one that escaped with them? I believe it may be the oldest. The 11-year-old was murdered two years prior to this set of events, and I believe it was the 15-year-old who was murdered most recently. Did the IJ and the BIX... He was found credible, but they then confirmed that the one that was left behind has continued to be threatened by MS-13? That was the testimony, correct. So that's in direct conflict with the Ramirez-Meja case, where the family in Honduras weren't being threatened? That's exactly right. Both this court and the board... I'm sorry, yes, that is correct. What's the evidence on acquiescence by the state, by the police? Well, we have the fact that the police tortured Mr. Rodas' wife, and also that they specifically threatened to send an extermination group to murder the family. So there's direct state action there. And then in addition to that, there's acquiescence because we have evidence that there are, in fact, extermination groups operating that are comprised of gang members and police in the country, and that the gang members in this particular case were working with the police. There's no evidence that the police had refused to do anything about this incident? To the contrary, they were directly involved in these incidents. So this is not a matter... This is not like an unable or unwilling situation in the asylum context. Does it have to be a local police force or some bad actors in the police force? It has to be nationwide, is that correct? It actually does not, Your Honor. This court addressed this specific fact in Garcia v. Holder, where it held that it doesn't need to be the policy of the government, it doesn't need to be high-level officials in the government, but it's sufficient even if it's a single police officer acting under color of law. The court has defined color of law to include a police officer even if he's acting under his own personal motives. So the fact that the government itself, the high-level members of the government, are opposed to torture does not negate the fact that torture is pervasive in El Salvador. To what extent... I know you mentioned the evidence that was not discussed. To what extent is there an obligation of either the IJ or the BIA to discuss each and every piece of evidence as opposed to the arguments? Because it seemed like they did have a pretty fulsome discussion of other evidence. So your argument, as I understand it, is that they left out certain things that you believe to be particularly important. That's correct, Your Honor. So this court in Cabrera v. Sessions held that the board does not need to address every single fact that's put before it, but it is a legal error that requires remand where they fail to consider key evidence. And so what we're talking about are key facts, facts that would materially move the needle on the likelihood of future torture if Mr. Rodas is returned. Specifically, going back to the torture of his wife, the record reflected that the police detained his wife for three days, during which time they placed her in a barrel of water, a reference to the practice of simulated drowning or waterboarding. And both this court and the board have emphasized that the torture of a similarly-situated family member is a material factor for determining the likelihood of future torture. And Ramirez Mejia? Your time's up, but that's what happens when you split. But of course, you've got time for rebuttal. Sure. Okay, thank you. Thank you. Ms. Pergolesi, is that it? Thank you. Good afternoon, Your Honors. Thank you for accommodating us. Sarah Pergolesi, for the respondent, and may it please the court. I'd like to start by emphasizing that the statute requires that— You're going to have to talk up a little bit. Excuse me. I'd like to start by emphasizing that the statute requires that motive is central. And therefore, a weighing of motives to determine which motives are central and which are not is necessarily required by the plain text of the statute and this court and board and Supreme Court precedent. Where the parties disagree is whether or not— Is there a circuit split on this? Or is the government arguing this in a uniform way as to all asylum petitioners around the country? The Fourth Circuit has a different mixed motive framework than other circuits. The Tenth joined the Fourth, or did they not? The Tenth did not. The Tenth rejected the Fourth Circuit's reasoning. But the Seventh, Ruano, has. The Seventh has inconsistent case law. So the Seventh also has a case, Ferreira, which essentially rejects a predicament-only approach. The petitioner—and that's not cited in our briefs, but because the Seventh is conflicting, I didn't file a 28-J about it. But the government's position is consistent across the country? Yes. Can I also— It's where we can argue it, yes. Because you wouldn't want a petitioner who has the same situation to be able to stay in one circuit and not the other. I mean, it certainly causes—is a natural— To help me understand this case, is it fair that I can get out of my mind, the government agrees that an immediate family can be a protected social group. Absolutely. And that's the law of the land. And you are not arguing here that the two killings and the threats to annihilate the family don't rise to a sufficient level of persecution?  Obviously, murders rise to the level of persecution. There is the requirement that persecution be specific to that. And the statute here contemplates mixed motive cases? Absolutely, yes. So is the issue just simply, does the record compel the conclusion that the animus to the family, to punish the family, was at least one central reason? Is that what we're doing? Just to put a slightly finer point on it? Whether the family was a central reason or not. Yes, that's the only issue. And with respect to animus, I'd like to point the court to another case that I think is helpful in drawing this line. It's a case out of the First Circuit. It's Aldana Ramos v. Holder, and it's a case from 2014. And I'm sorry, I have it here. It's 957 F3rd 9. Okay, but now, if this is a helpful case for us, if you didn't cite it, it means they have no idea what you're talking about. I'm not sure if I cited it. Okay. I can file a 20HA and give them an opportunity to respond. Okay, that would be great. But I would just like to cite it as an example where animus did possibly exist to show how different this case is. In that case, the petitioners were a set of brothers, and their father was kidnapped. They were a wealthy family that had some sort of farm, big farm. Their father was kidnapped for ransom. The family sold off property and divested themselves of resources to pay the ransom, but the father was killed nonetheless, and then the family continued to be threatened by that same gang. There, essentially, the money motive fell out, and the family was still targeted, showing that animus may exist. Right, but okay, I'm going to interrupt you because that argument is exactly why I have apprehensions about this case because if really the predominant motive was to conscript the children, once the father's made it clear he'll let his child be killed, MS-13 knows at least at that point they're not going to enlist people. They try again even with the second child, and the father says no to the point his child is killed. So it sounds to me at that point when they say, we'll kill you all, they're not going to get anybody. No one can pretend in the head of these MS-site sociopaths they're still trying to conscript people. They're now punishing the family for their resisting. The facts are not exactly what you said, Your Honor. The first son, there were no such threats to the petitioner himself about the recruitment of the first son. He was killed, the petitioner suspects, it was because he was under recruitment attempts, but he actually received no threats and couldn't articulate the reason why his first son was killed. The threats only occur two months before the death of the second son. And the petitioner has a third son that lives in El Salvador now and who he says has been threatened, but he cannot connect those threats to the recruitment efforts or something else, or a revenge. But the theory of the IJ and the BIA is that, oh, we know in their head these sociopaths, they're just trying to conscript. That's the motive. Anything else is, the government brief says, just not enough, it's incidental. But if you fail every time you try to conscript and you still say you'll kill them all, how can that not be you now want to punish the family? How is that even plausible? Essentially, if the threat is to coerce recruitment and only that, just the timing of the threats we have here, there's no evidence that compels the conclusion that even outside of the recruitment... What if they kill two children who are maybe of recruitment age if we think an 11-year-old is, and then they say, and if you don't, we'll kill the grandmother. Clearly, they're not trying to recruit the grandmother. Right. But the petitioner, those aren't the facts of this case. I thought they said they'd kill the whole family, so they're going to kill the mother. They aren't trying to recruit the mother. I don't know if the petitioner ever testified whether his... If the testimony here is that they would annihilate the family, including the mother, how can we affirm that, no, we really know they're just trying to recruit the mother? Essentially, it's a close case, but the evidence does not compel that there's animus against the family or intent, or that that threat... My worry about the means-ends approach is it creates a null set, right? Oh, we're going to kill Jews, but it's not because we have animus to Jews, it's they have money. Won't that always work that way? Bad people want things, but they may also harbour animus and especially retaliate. In this case, if it's not this case, I can't see one, because they keep punishing the family for not letting the kids. L.A. 1 contemplates that animus can be sufficient and can prove that the motive meets that centrality requirement, and in the case of the Nazis, there's certainly animus towards the Jews. I think that analogy is not compelling. If they have animus to the family, they're going to kill them because two of their children resisted them. They killed both of them. And there's another one that the government says should be deported back because we know they're just trying to get them and keep them alive as conscripts. It's not because they're trying to punish this family for defying them? That's just minimal and it's not enough? Is that the argument? Yes, it is. It's that the petitioner did not establish that the gang was motivated. Because this is the government's position that final child is going back because we know the sociopaths are not trying to punish the family even though they told two of their children or at least one not to become a conscript. Well, again, there's no evidence that that child has been threatened or recruited. If you're wrong about that factually, do you lose this case? Because I thought he stood up and said that the evidence is they were told we'll kill the whole family. I'm not discounting that. Okay, so then there's evidence they'll kill that child. But again, it's one threat in the timing that shows that the threat was made to coerce the recruitment of the second son. Or at least it's not compelling. And I understand that you find that you're... The means-ends approach I find to be very inhumane and I think it gets you to a jump set. I'm not saying these are Nazis. I am saying you could have animus to people for whatever religion or ethnicity they have and that it would always be because you want their house or you want their money or you want their child as a conscript. So we're just going to not deny that they are angry that this family is resisting them. And I'm worried you would never get better facts for a family saying no. I think we do have better facts in the case of Martinez-Lopez that the petitioner cites in 28J in that the petitioner again, the difference is the timing. So the petitioner again, the father of that family had a personal animosity or the gang perceived a personal animosity because of his relationship to a rival gang member. Killed him. Killed him and then the threats continued to the family. And again, so that is very different factually from this case. And they said that I forget the exact language but they made a similar everyone from this line will die but the timing there is after again that personal animosity fell out, that rival gang relationship fell out and the family continued to be persecuted after that and again. Well they tortured the husband, it's awful too and she flees. And we, our court I guess unpublished said somehow that is a reasonable they had in mind killing the family there but two children killed the family isn't being punished. There the family is but here it isn't. The petitioner bears the burden of proving I agree, it's their burden with direct or circumstantial evidence and again the evidence is not so overwhelming in this case to show that the motive that the family motive had that centrality that's required. Well I thought family motive is, I guess that's the test but we're talking about are they trying to punish the family and I, you've just heard my incredulity, it seems like they're punishing maybe they want to conscript after the first child, maybe even the second but after the father tells his children no you cannot join, it seems to me the reason they keep threatening them including the one who's left behind is because now they're mad at the family but the government says that's just not what was in their head. The government's not trying to get into the head, but that's the test basically the government's saying that there's no evidence of that motive because again the son that remains is there's test, the petitioner testified that he was threatened but he didn't testify as to the nature of those threats or whether they were connected to the father's actions and so again the family that remains in El Salvador is like the family in Ramirez Mejia that remains Oh it's opposite Ramirez they weren't touched, they were unperturbed the only testimony we've got as to the family in this case is that MS-13 is threatening them, it's the opposite. We don't know why and what is important is that the motives of the persecutor are critical as the Supreme Court has said, as this court has said and without proof of motive then the petitioner can't succeed on his claim. According to the record who are, aside from the son, what other family members that we know are still there? It's unclear, I don't actually know and I if there's evidence it would be in the asylum application about the petitioner's parents I'm asking only about the record Yeah I can't answer that question specifically but we do know that the petitioner's wife's family members are in El Salvador because that's where the son is living but again I don't know, I can't say confidently whether the petitioner justified one way or the other about his parents and it would be in the asylum application if it's there I would just like to conclude with respect to the motive issue in that this case is like other cases where this court has found that the evidence does not compel that the motive was sufficiently central in that the petitioner had something of value to the gang and that was his son's as viable recruiter. It's like LEA 1 in that sense in that the applicant had something of value to the gang which was access to his store and the fact that the petitioner had that access because of his family relationship is insufficient he could have been a teacher, a friend a mentor and I understand the court's concerns with this test but the means to an ends test is essentially just another way of saying that the motive of the persecutor is critical and that it must be central. Tell me again why means to an end gets to an opposite result in Lopez v. Garland? In Lopez v. Garland? Yeah, or the decision, the March decision of this year. Weren't you using that as one as an example where we will find that there's a nexus to the family? I'm sorry Lopez is... What was the case you started out saying, I may have mixed it up, where you said look there is a limiting principle here. Here's an example where the family... Oh I'm sorry, yeah that might be Martinez Lopez, I'm sorry that I... No, no, no, I'm mixing up the petitioner cited in his most recent 20H. Yes and where is there better nexus proof there? What's what are you relying on? The timing of the threats, your honor. So again because the petitioner, there's a sequence of both more threats to the entire family but also the nature of the fact that the essentially triggering event, the father's relationship to his aunt that was a member of the rival gang happened first and then the threats continued but here the threats denied. The rule gets more complicated because it would seem like I guess the end there is to vanquish the rival gang the aunt's a member of. So they had an end that had nothing to do with the family. With the father yeah. Yeah. But then once that fell out they continued to threaten the family. True but that's, you see, you see why that's exactly my problem here because the recruitment failed twice. It looks like it's on all fours with that case. The reason that the IJ and the BI accepted they never accomplish and so now they're just going to kill everyone, even people they can't recruit. That is what MS-13 does. Again, I think just that the evidence is not compelling in this case but I understand the court's case. Yeah. Okay, that's nicely put. I appreciate it. I'm sorry to know there's this heavy record. There's no, you are. I'm only pushing because I'm surprised the government embracing means approach because I find that to be but I do agree you have a standard of review. I don't remember if we flipped the BIA in that case or if we affirmed. I don't remember. We probably affirmed. Well, I think you couldn't possibly affirm the board because the government can appeal board decisions so it knew necessarily would have granted the petition. That was for the family. Husband killed but two children killed, not trying to punish family. I understand the concerns. Again, I think it's just a matter of the timeline. This case is in a sense then similar to Gonzales-Veliz where the family relationship existed before the threat occurred, another triggering event, right, the child support claims. Then the thing that most immediately preceded the threats. I'd like to also just point the court to the idea that a threat can be to coerce and not necessarily be the intent might not be the nature of the threat. The intent may be to coerce. Like extortion cases. Right, like extortion cases. I'm not sure if this court specifically has it but there are other courts of appeals that have more substantial law about certainly the use of, for example, slurs in extortion or other crime attempts. Pointing out someone's relationship again might not necessarily show an intent to harm them because of that relationship. Here they show that they were fully capable of carrying out the threat. Yes. A lot of the courts, the cases that do seem to embrace what I think is an atextual ill-advised test, means to where there's one call to the parent. This case, as Judge Davis just mentioned, this is two of four children killed. Two children, yeah. Two of four. Two of four, I'm sorry. So the guy sounds like he's William Tell. He's saying no, no, and their reason that BIA says exists, they never recruited anybody. The facts indicate that he said no once. We don't have any facts about what happened to the first son. If that's true, then there's no reason at all other than family. You're saying they weren't trying to recruit the kid? They just killed him? He testified that he didn't know why his first son was killed. He believed it was because... I know, but we are trying to balance. We're trying to figure out what is the... To affirm, we've got to say, as you said in the brief, it's incidental. This is just a superficial reason. They're killing the whole family. No punishment effort. I understand the Court's concern. Okay. No, you've answered. You've covered the ground. The statute requires that centrality is important and it necessarily means weighing when it comes to difficult cases like this one. I think as the Court, as our conversation has certainly indicated, the main quarrel in this case is the factual issue of whether that weighing is supported by the record or not. I understand your concern with the means to and ends test, but I think more fundamentally it is about the weighing of these facts and whether they compel that the family motive was sufficiently central. But again, given the Court's substantial evidence review test and given the dearth of evidence one way or the other in this case, we would urge the Court to deny the petition for review. I'm almost out of time if the Court would like to talk about CAT. I certainly can talk quickly about that. I'd just like to stress as Judge Engelhardt pointed out, this Court is under no obligation to write an exegesis about every fact, but certainly the petitioner is correct that it has to address important facts and critical facts. But here the agency, even in failing to address the issues with the wife, considered the facts that are key to the petitioner himself's claim that he faced a particularized risk of torture. And again, the evidence does not compel the conclusion that he would face a particularized risk of torture by the government. And I would just like to point out that even considering the wife's experience as the petitioner testified during his first merits hearing, he didn't renew it during his remand hearing, he did not tie, again, the threats of those police officers to this gang recruitment, which is the crux of his claim, the recruitment attempts and threats. And so again, it's not necessarily probative that he faces a particularized risk of torture. And for these reasons, I'll sit down. Thank you. Thank you, Your Honors. Thank you, Your Honors. First, just to address Judge Engelhardt's question, there are no members of this nuclear family left in the household, excuse me, in the country, except for the half, our stepson, who we know has been threatened. It's true that the record doesn't say exactly why, but we think it's a reasonable inference given the timing that it's likely to be in retaliation against the family. But is he, just to, this isn't a big point, but is he living with other family members as was suggested, or is it... The social group in question here is the nuclear family. I believe he's living with the Weiss family, a distant family. I also wanted to point out that we're not only asking for a finding in our favor in Nexus, we're also asking the alternative for remand because we don't believe these facts have been properly considered. Judge Higginson, I think you... You don't think that IJ and the BIA went through this mixed motive test? The board's decision doesn't address the torture of the wife, which the record does show is at the instigation of MS-13. It doesn't address the fact that the threats were to murder the whole family, and that threat was not made one time, but multiple times. It doesn't address the fact that the... There is no doubt in terms of the timeline theory that there was a threat to annihilate the whole family after they couldn't recruit the second child. There's no doubt about that? No, because that actually did, as far as I understand it, Your Honor, Mr. Rodas and his family. They didn't stick around to find out whether, after the second son was murdered, the gang was going to come and murder them as well. I don't think that should be the requirement for someone to succeed. So what's the sequence? The first kid's killed, we just don't know why. Then there are threats about recruiting the son, then the wife is tortured by the police at the instigation of MS-13, and then the second son is murdered and they leave the country. And then the stepson is... And the father testified, and he was credited, that he had told the second son not to join. That's correct, Your Honor. Then they kill him. When is the threat to annihilate them all? That's at the very beginning. The very first thing that the gang does is they come to Mr. Rodas' house and they say, we will kill your whole family. We will kill your whole family if your son does not join our gang. Okay, well that sounds like, if you're right about that factually, that sounds like that was before the killing of the first child. That was before the killing of the second child. Okay, so first child is killed. Then they make the threat for conscription. Right. Then they carry it out. They're not conscripting anyone. They flee. There's one child left. That's correct. Now, Your Honor, if it's all right, I'd like to turn back to the means to an end test, because as you were saying, Judge Jacobson, there are significant problems with this test. It's completely unprecedented and goes against the very purpose of the asylum laws. Under the government's test, if a hypothetical dictatorship were to target an entire ethnic minority for extermination in order to seize their land or resources, the government's test would compel that membership in the group was not one central reason. And that's clearly an uncertain result. The asylum laws were created precisely because the worst atrocities of the 20th century were carried out as part of systemic persecution and genocide. They were carried out by groups like the Nazis who did so for very strategic reasons, the consolidation of power and the accumulation of wealth. So that's not the way we approach asylum law, and it should not be. But I also want to say that the claim that the test is rooted in LEA 1 is incorrect. The decision in LEA 1 did use the phrase means to an end. It said that where a persecutor targets a family member, not an entire family, the means to an end, that by itself is not necessarily sufficient. You ought to just, because you have so little time, you're preaching to the choir with me that that test is a very, very scary test, but they still have a standard of review. You've got to show that the record compels the conclusion that in the head of the sociopaths they had decided at some point to punish the family instead of try to get them alive. Right. I mean, we have that in the express words of the persecutors themselves. We are going to kill your entire family. There's no better evidence that an applicant could possibly come up with in this case than those words. And I just note that the applicant usually is not required to come up with concrete direct evidence of the persecutor's motive. They can use circumstantial evidence. This is about as strong as a case can get for establishing that the persecutor's intent was, in fact, to enact collective violence against the entire social group. And when you're seeking to exterminate an entire social group, an entire protected social group, just like when you're seeking to exterminate an entire religion, or an entire race, or an entire ethnicity, that is classic persecution, and that's precisely the type of violence that these laws were enacted to protect against. You both have made strong arguments. We really appreciate again your getting here, and the tone, difficult case, just these facts are anguishing. Thank you.